1  **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                     FOR THE DISTRICT OF ARIZONA

8

9  Timi M. Reed,                          )   No. CV 07-0396-PHX-MHM
                                          )
10              Plaintiff,                 )   **ORDER**
                                          )
11  vs.                                    )
                                          )
12                                         )
    Honeywell   International,   Inc.;   Loren )
13  Strelow; Jamie Eden,                  )
                                          )
14              Defendants.               )
                                          )
15  _____  )

16

17        Currently before the Court is Defendants' Motion for Summary Judgment (Dkt.# 61)

18  and Plaintiff's Motion for Sanctions for Sanctions for Spoliation of Evidence (Dkt.#64).

    **I.      Factual Background**
19
          The following facts are undisputed: Honeywell hired Ms. Reed as a Compliance
20
    Manager in Honeywell's Aerospace Defense & Space Market Segment in March 2000.
21
    (Dkt.#62 ¶ 5)  She was later promoted to  the position of Transaction Team Leader and
22
    supervised seven to ten employees.  (Dkt.#62 ¶ 8)  In Fall 2002, Ms. Reed went on a six-
23
    week military leave to attend Squadron Officer School. (Dkt.#62 ¶ 9) During this first leave
24
    of absence, she was encouraged to communicate with her subordinates using a portable
25
    computer that Honeywell provided her.  (Dkt.#65 at 7)
26
          In June 2003, she began a second military leave of absence from Honeywell that
27
    lasted six months. Ms. Reed testified that when she informed her supervisor, Dave Cameron,
28

1    of the exact dates of her upcoming military leave, he said "I can't believe this!  Did you

2    volunteer for this?" and shook his head and threw up his hands.[1]  (Dkt.#65, PSAF ¶ 4)  Ms.

3    Reed interpreted these remarks and body language to mean that he was mad that she was

4    going to leave.  (Dkt.#65, PSAF ¶ 5)

5            During her second military leave of absence, she communicated with her subordinates

6    as she had done during her first leave of absence.  (Dkt.# 65, PSAF ¶ 7; Dkt.#62 ¶ 12)

7    However in late August of 2003, she was instructed to direct her comments to Mr. Strelow,

8    the person who had taken over her duties as a supervisor, rather than to her subordinates

9    regarding a specific, work-related issue that had arisen.  (Dkt.#62 ¶¶ 13, 14; Dkt.#65 ¶ 13,

10   PSAF ¶ 8)  When she asked for clarification, she was instructed not to communicate with

11   her subordinates at all during her leave because it caused confusion and undermined her

12   replacement supervisor's ability to manage the team.  (Dkt.# 65 ¶ 13, Dkt.# 62 ¶¶ 14, 15)

13   Accordingly, after September 22, 2003, she did not communicate with her team regarding

14   business issues.  (Dkt.# 65, PSAF ¶ 8)

15           Before her second military leave, Ms. Reed had received three separate Continuous

16   Improvement Summaries (evaluations).  The last of these, dated February 7, 2003, stated that

17   Ms. Reed was an "effective team leader," a "strong team player," a "good communicator,"

18   and a "role model."  (Dkt.# 65, Plaintiff's Statement of Additional Facts ["PSAF"] ¶ 3)

19           During her absence, Honeywell hired Jamie Eden as its Human Resources Manager.

20   (Dkt.#62 ¶ 18; Dkt.# 65 ¶ 18)  He testified that while Ms. Reed was away, several of her

21

22

23

24   _____

25           [1]  Defendants object to this testimony, arguing that it is inadmissible hearsay.
     (Dkt.#69, Objections to PSAF ¶ 1)  However, it is not being offered to prove the truth of the
26   matter asserted (that Dave Cameron in fact could not believe it or that she in fact asked to go
     on military leave) and therefore cannot be hearsay.  Fed. R. Evid. 801(c) ("Hearsay" is a
27   statement . . . offered to prove the truth of the matter asserted.")  Defendants do not raise any
     other objection to this statement.  (Dkt.#69, Objections to PSAF ¶ 1)
28

1  subordinates complained that she was not an effective leader, that she had favorites on the

2  team, and that she was abrasive.[2]  (Dkt.# 62 ¶ 19)

3      Ms. Reed finished her military leave on December 8, 2003.  (Dkt.#65, PSAF ¶ 9;

4  Dkt.# 69 at 2 [no objections])  She returned to work at Honeywell on January 19, 2004.

5  (Dkt.# 62 ¶ 23)  She was reinstated to her former position as Transaction Team Leader and

6  had the same work schedule, work location, hours, salary, and benefits as she had before her

7  military leave.  (Dkt.#62 ¶ 24; Dkt.#65 ¶ 24)

8      Upon her return, she met with Mr. Eden and Mr. Strelow.  (Dkt.# 62 ¶ 25; Dkt.#65

9  ¶ 25) The purpose of the meeting was to bring her up to speed on the events that occurred

10  during her absence.  (Dkt.# 62 ¶ 26; Dkt.#65 ¶ 26)   The next day, Mr. Eden recommended

11  that Ms. Reed participate in a "reassimilation meeting."  (Dkt.# 62 ¶ 29; Dkt.#65 ¶ 29)  She

12  suggested that she instead meet with her team members individually, but Eden refused and

13  mandated that she participate in the reassimilation meeting.  (Dkt.#65, PSAF ¶ 11; Dkt.# 69

14  at 2 [no objection])  Ms. Reed  testified that the reassimilation meeting was held because of

15  her military deployment.[3]  (Dkt.# 65 PSAF ¶ 10)

16      At the reassimilation meeting, in the presence of her subordinates, Plaintiff was

17  presented with a number of unattributed complaints regarding her management style.  (Dkt.#

18  65 PSAF ¶ 13; Dkt.# 69 at 2 [no objection])  These complaints included allegations that "she

19  didn't walk past some people's desks and say 'hi' in the morning," that "she walked past

20  other people's desks too much," that "she micromanaged some employees," that "she

21  required employees to account for their numbers," and a variety of other adverse comments.

22  (Dkt.# 65 PSAF ¶ 13; Dkt.# 69 at 2 [no objection])  Ms. Reed testified that this meeting

23

24      [2]  This testimony is part of the testimony that Plaintiffs seek to strike in their motion
for sanctions, discussed below.  (Dkt.#65 ¶ 19)

25

26      [3]  Defendants object to the statement that "the reassimilation meeting was held
because of Plaintiff's military deployment" on the basis that "the record cited does not

27  support the statement."  (Dkt. # 69, ¶ 2)  However, Plaintiff did indeed testify that the
reassimilation meeting was held because of her military deployment. (Dkt. # 65, PSAF ¶ 10,

28  Exh. 1 at 121-122)

1    humiliated her and that it undermined her authority as a manager by encouraging her

2    subordinates to criticize her anonymously in front of other subordinates, with the approval

3    of Mr. Eden.  (Dkt.# 65, Exh. 5 ¶ 4)  One of Ms. Reed's subordinates, Carolyn Brower,

4    testified that the reassimilation meeting "involved outrageous and vicious attacks on Ms.

5    Reed's character and integrity by individuals with personal vendettas against her" and that

6    the "meeting was offensive to an extent far beyond what should be acceptable in a business

7    setting."  (Dkt.#65 Exh. 6 ¶ 3)  While Honeywell claims that the meeting did not alter Ms.

8    Reed's salary, title, benefits, or job responsibilities, Ms. Reed disputes this and states that the

9    meeting altered her job responsibilities and status.  (Dkt.# 62 ¶ 37, Dkt.# 65 ¶ 37)

10    After the reassimilation meeting, Mr. Eden met with Ms. Reed to discuss the ongoing

11    complaints regarding her management style.  (Dkt.#62 ¶ 44; Dkt.#65 ¶ 44)  Mr. Eden shared

12    additional complaints by Ms. Reed's subordinates with her and stated as follows: "maybe

13    you have too many things going on in your life at the current time, you have your grandson

14    living with you, *you have your military commitment* and you have a full time job."  (Dkt.#

15    62 ¶ 47; Dkt.# 65 ¶ 47 [emphasis added])

16    After the reassimilation meeting, Ms. Reed was given a 2% lump sum merit increase.

17    (Dkt.# 62 ¶ 39, Dkt.# 65 ¶ 39)  Seven of her peers received salary increases at the same time.

18    (Dkt.# 65, PSAF ¶ 17) Two of her peers did not receive a salary increase.  (Dkt.# 62 ¶ 41,

19    Dkt.# 65 ¶ 41)

20    Ms. Reed testified that her authority was systematically taken away by Mr. Eden and

21    Mr. Strelow because they allowed her subordinates to go to them directly for basic

22    management guidance.  (Dkt # 69, Exh. 1 at 106)  It is undisputed that none of the criticism

23    of Ms. Reed, either at the reassimilation meeting or afterwards, had been conveyed to her

24    before her military leave.  (Dkt.# 65 PSAF ¶ 20, Dkt.# 69 at 2 [no objections])

25    Honeywell also removed Ms. Reed's vacation pay while she was on military leave but

26    immediately restored it after being notified by Ms. Reed.  (Dkt.# 59, SSUF ¶ 1; Dkt.# 65,

27    PSAF ¶ 21)

28

1    Mr. Eden commented to Ms. Reed that maybe she needed to think about a change in

2   her career path because she had too much going on in her personal life to be a manager,

3   including her National Guard involvement.  (Dkt.# 65 ¶ 22, Dkt.# 69 at 2 [no objection])  It

4   is unclear from the record whether this was the same comment he made before or whether

5   this was a separate event.

6    On May 10, 2004, Ms. Reed met with Mr. Eden and complained that she felt she was

7   being discriminated against based on her military leave.  (Dkt.# 62, ¶ 49, Dkt.# 65, ¶ 49)

8   Honeywell's Director of Human Resources, Susan Mattick, met with Ms. Reed to discuss her

9   concerns and took several actions to investigate her complaint, including reviewing her lump-

10  sum merit increase, meeting with Mr. Eden to develop a plan for moving forward, and

11  meeting with a cross-section of the members of Ms. Reed's team.  (Dkt.# 62, ¶ 52; Dkt.# 65

12  ¶ 52)

13   On July 22, 2004, Ms. Reed's co-worker reported to her that one of Ms. Reed's

14  subordinates, Donna Carlough ("Ms. Carlough"), was soliciting Ms. Carlough's co-workers

15  to give Ms. Carlough BRAVO cash awards (an employee recognition system).[4]  (Dkt.# 62,

16  ¶ 57; Dkt.# 65 ¶ 57)  Because Ms. Reed believed that this conduct was an abuse of the

17  program, she immediately reported it to Mr. Eden.  (Dkt.# 62, ¶ 59; Dkt.# 65 ¶ 59)  After

18  discussing the situation, Mr. Eden and Ms. Reed met and interviewed three employees and

19  discovered that Ms. Carlough had solicited at least four other employees for BRAVO awards.

20  (Dkt.# 62, ¶ 63; Dkt.# 65 ¶ 64)  The parties dispute whether Mr. Eden advised Ms. Reed on

21  July 22, 2004 that the investigation should be kept confidential and instructed her not to

22  discuss the investigation with others.  (Dkt.# 62, ¶ 57; Dkt.# 65 ¶ 64)  However, Ms. Reed

23  testified that in any case she understood that she was not to discuss Ms. Carlough's situation

24  with any of Ms. Reed's subordinates and agreed that discussing an employee's unethical or

25  inappropriate behavior with others was not appropriate.  (Dkt.# 62, ¶ 66; Dkt.# 65 ¶ 66)

26

27    [4] The BRAVO program allowed Honeywell employees to give one another $25 cash
    awards, without management approval, for recognition or as a thank you.  (Dkt.#62 ¶ 56;
28  Dkt.#65 ¶ 56)

1       Ms. Reed had been trained on Honeywell's Code of Business Conduct in July 2004.

2   (Dkt.# 62, ¶ 69; Dkt.# 65 ¶ 69)  Within the Code, it states that "employees have a duty to

3   cooperate fully with the company's investigative process and to maintain the confidentiality

4   of investigative information unless specifically authorized or required by the law to disclose

5   such information.  (Dkt.# 62, ¶ 67; Dkt.# 65 ¶ 67)  However, this statement was a single

6   sentence was the ninth item in a ten-item list on page 29 of a 32-page document.  (Dkt.# 65,

7   PSAF ¶ 27; Dkt.# 69 at 2 [no objection])

8       On July 26, 2004, one of Ms. Reed's subordinates, Ms. Brower, sent an email to Ms.

9   Reed expressing concern about her (Ms. Brower's) conduct in giving Ms. Carlough a

10  BRAVO award.  (Dkt.# 62, ¶ 71; Dkt.# 65 ¶ 71) Ms. Reed responded to Ms. Brower's email

11  as follows: "Don't upset yourself any more about this.  Remember . . . it's not 'making a

12  mistake' that hurts us in most cases, the focus needs to be on how we 'make the mistake

13  RIGHT.'  You've done a great job to protect the integrity of this situation."  (Dkt.# 62 ¶ 71;

14  Dkt.# 65 ¶ 71)

15      On or about July 27, 2004, Ms. Reed and Mr. Eden had a meeting with Ms. Carlough

16  in which she admitted that she solicited BRAVO awards from her co-workers to pay for her

17  daughter's wedding dress and that her conduct was inappropriate.  (Dkt.# 62, ¶ 72; Dkt.# 65

18  ¶ 72)  Ms. Reed testified that she believed that Ms. Carlough's employment had been

19  terminated at the meeting.  (Dkt.# 62, ¶ 74; Dkt.# 65 ¶ 74)

20      Honeywell claims that Mr. Eden specifically instructed Ms. Reed not to discuss Ms.

21  Carlough's status or to respond to any questions or requests for information about the

22  investigation; however, Ms. Reed disputes this assertion.  (Dkt.# 62, ¶ 75; Dkt.# 65 ¶ 75)

23  She does agree, though, that Mr. Eden directed her not to discuss the investigation.  (Dkt.#

24  65 ¶ 76)

25      On an unspecified date, Laura Barrow told Ms. Reed that everybody who had

26  something against Ms. Reed were the ones that Ms. Carlough solicited for a BRAVO award.

27  (Dkt.# 62 ¶ 79; Dkt.# 65 ¶ 79)  Ms. Reed responded, "Isn't it surprising that it's the same

28

1   people that didn't want me back." (Dkt.# 62 ¶ 79; Dkt.# 65 ¶ 79)  Mr. Eden testified that Ms.

2   Barrow later reported Ms. Reed's comment to him.[5]  (Dkt.#2 ¶ 80).

3          Following the investigation, Mr. Eden recommended that Ms. Reed be terminated for

4   breaching the confidentiality of the investigation in violation of the Code of Business

5   Conduct and Mr. Eden's directives. (Dkt.# 62 ¶ 88, Dkt.# 65 ¶ 88) He shared with the group

6   his belief that Ms. Reed discussed the investigation on multiple occasions, despite his

7   instructions not to do so.  (Dkt.# 62 ¶ 88, Dkt.# 65 ¶ 88)  Based on Ms. Reed's alleged

8   conduct in discussing the BRAVO investigation in violation of the Code of Business

9   Conduct and Mr. Eden' s specific directive, Honeywell concluded that there was "cause" for

10  Ms. Reed's termination.  (Dkt.# 62 ¶ 92, Dkt.# 65 ¶ 92)

11         Honeywell ultimately terminated seven employees for abusing the BRAVO system.

12  (Dkt.# 62 ¶ 108, Dkt.# 65 ¶ 108)  Honeywell also terminated Ms. Reed.  (Dkt.# 62 ¶ 82;

13  Dkt.# 65, PSAF ¶ 28)  The termination letter read as follows:

14         Dear Timi:

15         As you are aware we have been conducting an investigation into
           alleged abuses of the BRAVO Reward and Recognition system.
16         During the course of that investigation you were instructed on
           multiple occasions not to discuss the investigation.  You did so
17         anyway.  Your actions constitute a failure to follow direct
           instructions, potentially interfered with the investigative process,
18         constitute unacceptable supervisory behavior and are
           representative of an ongoing pattern of exercising poor
19         judgment.  Honeywell simply cannot and will not tolerate such
           behavior.  Therefore, your employment is being terminated,
20         effective today.
           ...
21
    (Dkt.# 65 Exh. 11)
22
           Ms Reed testified that she was never warned during the BRAVO investigation that
23
    she was violating the Code of Business Conduct or risking termination of her employment.[6]
24

25  _____

26         [5]  This testimony is part of the testimony that Plaintiff urges should be stricken on
    spoliation grounds, discussed below.

27         [6]  Defendants object to this statement with the somewhat cryptic assertion that it is
28  hearsay. Federal Rule of Evidence 801(c) defines "Hearsay" as "a statement, *other than one*

1    (Dkt.# 65, PSAF ¶ 31)  Though Defendants dispute her statement, Ms. Reed testified that she

2    did not violate Mr. Eden's directive not to discuss the investigation and did not speak about

3    the investigation.  (Dkt.# 65 PSOF ¶ 32 ; Dkt.# 69 at 3)  Ms. Reed received no employer

4    complaints regarding her performance prior to her deployment in 2003.  (Dkt.# 65, PSAF ¶

5    6; Dkt #69 at 2 [no objection])

6          Ms. Reed subsequently filed a complaint alleging that during the period of her re-

7    employment, Honeywell, Strelow and Eden violated the Uniformed Services Employment

8    and Reemployment Rights Act of 1994 ("USERRA") by (a) failing to eliminate or minimize

9    the disadvantages to her career and employment which resulted from her military service, (b)

10   discriminating against her because of her military service, (c) failing to re-employ her in a

11   position of like seniority and status, and (d) discharging her within one year of her re-

12   employment.  (Dkt.#1 at ¶ 14).

13   **II.     Defendants' Motion for Summary Judgment**

14         Defendants move for summary judgment, arguing that Ms. Reed cannot establish that

15   she was discriminated against or terminated because of her military service and that she is

16   not entitled to liquidated damages as a matter of law.  (Dkt.# 61 at 10-16)  This order

17   addresses the summary judgment standard, discusses USERRA legal framework, then

18   analyzes the claims.

19         **A.     Summary Judgment Standard**

20         A motion for summary judgment may be granted only if the evidence shows "that

21   there is no genuine issue as to any material fact and that the moving party is entitled to

22   judgment as a matter of law." FED. R. CIV. P. 56(c).  A material issue of fact is one that

23   affects the outcome of the litigation and requires a trial to resolve the differing versions of

24   the truth. *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1305-06 (9th Cir. 1982).  To defeat the

25   motion, the non-moving party must show that there are genuine factual issues "that properly

26

27   ─────────────────────

28   *made by the declarant* while testifying at the trial or hearing, offered in evidence to prove the
     truth of the matter asserted.  Because Ms. Reed is the declarant, this statement is not hearsay.

1  can be resolved only by a finder of fact because they may reasonably be resolved in favor of

2  either party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986).   Summary

3  judgment is appropriate against a party who "fails to make a showing sufficient to establish

4  the existence of an element essential to that party's case, and on which that party will bear

5  the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

6       **B.    USERRA**

7       "USERRA forbids employment discrimination on the basis of membership in the

8  armed forces." *Townsend v. Univ. of Alaska*, 543 F.3d 478, 482 (9th Cir. 2008) (citing 38

9  U.S.C. §§ 4301(a), 4311(a)).  "An employer violates USERRA if an employee's membership

10  or obligation for service in the military is a motivating factor in an employer's adverse

11  employment action taken against the employee, unless the employer can prove that the action

12  would have been taken in the absence of such membership or obligation." *Townsend v. Univ.*

13  *of Alaska*, 543 F.3d 478, 482 (9th Cir. 2008).   "Under the [USERRA] scheme . . . , the

14  employee first has the burden of showing, by a preponderance of the evidence, that his or her

15  protected status was 'a substantial or motivating factor in the adverse [employment] action;'

16  the employer may then avoid liability only by showing, as an affirmative defense, that the

17  employer would have taken the same action without regard to the employee's protected

18  status." *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007) (quoting *Leisek v.*

19  *Brightwood Corp.*, 278 F.3d 895, 899 (9th Cir.2002) (alteration in the original).

20       "Unlike the *McDonnell Douglas* framework [used in Title VII claims], the procedural

21  framework and evidentiary burdens set out in section 4311 [USERRA] shift the burden of

22  persuasion, as well as production, to the employer." *Gagnon v. Sprint Corp*., 284 F.3d 839,

23  854 (8th Cir. 2002), *abrogated on other grounds*, *Desert Place, Inc. v. Costa*, 539 U.S. 90

24  (2003).  Thus, an employee must make "'an initial showing . . . that military status was at

25  least a motivating or substantial factor in the [employer's] action.'" *Id.* (quoting *Sheehan v.*

26  *Dep't of Navy*, 240 F.3d 1009, 1014 (Fed. Cir. 2001).  Upon such a showing, the employer

27  "'must prove, by a preponderance of evidence, that the action would have been taken despite

28  the protected status.'"  *Id.* (quoting *Sheehan*, 240 F.3d at 1014).  In contrast to Title VII

1   cases, "under USERRA, the employee does not have the burden of demonstrating that the
2   employer's stated reason is a pretext. Instead, the employer must show, by a preponderance
3   of the evidence, that the stated reason was *not* a pretext; that is, that 'the action *would* have
4   been taken in the absence of [the employee's military] service." *Velasquez-Garcia v.*
5   *Horizon Lines of Puerto Rico, Inc.*, 473 F.3d 11, 17 (1st Cir. 2007).

6   "The issue under USERRA is not whether an employer is 'entitled' to dismiss an
7   employee for a particular reason, but whether it would have done so if the employee were
8   not in the military." *Id.* at 20. The court in *Velasquez-Garcia* explained that while
9   "Velasquez's violation of the Code may well be a fireable offense under Horizon's policies,"
10  that was "only the beginning of the analysis." *Id.* The court required Horizon to go further
11  and "demonstrate, by a preponderance of the evidence, that it *would* have indeed fired
12  Velasquez, regardless of his military status." *Id.*

13  **C.   The Claims**

14  Defendants argue that Ms. Reed's claims fail as a matter of law because she cannot
15  establish (1) that she was discriminated against in violation of USERRA (2) that her
16  termination violated USERRA, or (3) that her claim for liquidated damages is merited.
17  (Dkt.# 61 at 10-16)

18  **1.   Discrimination**

19  Defendants argue that Plaintiff cannot meet her initial burden of showing, by a
20  preponderance of the evidence, that her protected status was a "a substantial or motivating
21  factor in the adverse [employment] action." Once she has met this burden, "the employer
22  may avoid liability only by showing, as an affirmative defense, that the employer would have
23  taken the same action without regard to the employee's protected status." *Wallace v. City*
24  *of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007).

25  Upon Ms. Reed's return from military leave, she was forced to participate in a
26  reassimilation meeting over her objection. She testified that she would have preferred to
27  meet with her subordinates individually in order to get up to speed on what had happened
28  during her absence but that the reassimilation meeting was mandated over her objection.

1   During the reassimilation meeting, she was presented with the anonymous complaints from

2   her subordinates and asked to respond to them in front of the subordinates.  She contends that

3   this experience was humiliating and that it undermined her authority with her subordinates.

4   Because of these effects, she argues that she was not reemployed with the same status she

5   had before her deployment in violation of 38 U.S.C. § 4131(a)(2)(A).

6       While "status" is not defined by USERRA, *Duarte v. Agilent Technologies, Inc.*, 366

7   F. Supp. 2d 1039, 1045 (D. Colo. 2005), it must be given its common meaning and includes

8   "general working conditions." *Monday v. Adams Packing Ass'n, Inc.*, 1973 WL 958 at *3

9   (N.D. Fla. 1973).  Defendants argue that the reassimilation meeting was not "an adverse

10  action" because it was not designed to humiliate her and was something that all managers at

11  Honeywell who are gone for extended periods of time must participate in.  However, the

12  reason that Ms. Reed had been absent for such a long time period was because of her military

13  service.  Therefore, Ms. Reed has established that her military service was, at a minimum,

14  one of the motivating factors in holding the reassimilation meeting.  Moreover, the fact that

15  Ms. Reed was allegedly humiliated by the experience and that it in fact apparently

16  contributed to the undermining of her authority among her subordinates means that it was

17  sufficiently "adverse" to withstand summary judgment on this point.  *See Brandasse v. City*

18  *of Suffolk, Virgina*, 72 F. Supp. 2d 609 (E.D. Va. 1999) (holding that a police department's

19  investigation of an officer was an adverse employment action where it resulted from his

20  military service).

21      Moreover, before Ms. Reed began her military deployment in 2003, she had received

22  no employer complaints regarding her performance.  The lack of employer complaints before

23  the request for leave, and the fact that her supervisor was apparently angered by the request

24  and the resulting absence are facts that support the conclusion that military service was a

25  motivating factor in the subsequent complaints and counseling.  *Robinson v. Morris Moore*

26  *Chevrolet-Buick, Inc.*, 974 F. Supp. 571, 576 (E.D. Tex. 1997) (lack of complaints before

27  military leave held to be plausible indirect evidence that leave was a motivating factor in

28  subsequent complaints and ultimate termination).  According to the Ninth Circuit, in

1   USERRA cases "discriminatory motivation on the part of the employer may be reasonably

2   inferred from a variety of factors, including proximity in time between the employee's

3   military activity and the adverse employment action, inconsistencies between proffered

4   reason and other actions of the employer, an employer's expressed hostility towards members

5   protected by statute together with knowledge of the employee's military activity, and

6   disparate treatment of certain employees compared to other employees with similar work

7   records or offenses." *Leisek v. Brightwood Corp.*, 278 F.3d 895, 900 (9th Cir. 2002).  Further

8   supporting this interpretation is/are Mr. Eden's comment(s) that she might have too much

9   going on in her life to be an effective supervisor given, among other things, her military

10  service.

11          Ms. Reed has not established that her military service was the *only* motivating factor

12  for Defendants' adverse acts.  However, under USERRA, she only needs to show that

13  military service was a substantial or motivating factor in the adverse treatment to make a

14  prima facie case.  *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007)  The

15  burden then shifts to Defendants to prove that they would have engaged in the behavior

16  regardless of the military service.  *Id.*  ("Under the [USERRA] scheme . . . , the employee

17  first has the burden of showing, by a preponderance of the evidence, that his or her protected

18  status was 'a substantial or motivating factor in the adverse [employment] action;' the

19  employer may then avoid liability only by showing, as an affirmative defense, that the

20  employer would have taken the same action without regard to the employee's protected

21  status.") (quoting *Leisek v. Brightwood Corp.*, 278 F.3d 895, 899 (9th Cir.2002) (alteration

22  in the original).  Plaintiff has thus presented sufficient evidence of her discrimination claim

23  to withstand Defendants' motion for summary judgment.

24          Defendants also argue that Ms. Reed cannot show that the following two items were

25  "adverse" or that they were motivated by her military service: (1) Mr. Eden's counseling of

26  Ms. Reed regarding her management skills and (2) the 2% lump sum merit increase Ms. Reed

27  received in March 2004.  (Dkt.# 61 at 11)  However, Plaintiffs do not appear to be arguing

28  that either item is independently sufficient to carry a discrimination claim.  In any case,

1    Plaintiffs have already carried their initial burden of showing that the military service was

2    a substantial or motivating factor regarding the reassimilation meeting and the changes in

3    Ms. Reed's supervisory authority; thus, Defendants' motion for summary judgment regarding

4    Reed's discrimination claim is denied.

5                         **2.      Termination**

6          Defendants also argue that Ms. Reed cannot establish that her termination violated

7    USERRA.  (Dkt.# 61 at 14)  Under 38 U.S.C. 4316(c), an employer cannot discharge a

8    returning veteran "except for cause" within one year of her return from active duty.  When

9    an employee is discharged "for cause," the employer has the burden of proving (1) that it was

10   reasonable to discharge the employee for the conduct in question and (2) that the employee

11   had notice (express or fairly implied) that the conduct would constitute cause for discharge.

12   20 C.F.R. § 1002.248(a).  "Because employers have the burden of proving that the discharge

13   was reasonable, it is difficult for employers to achieve summary judgment on claims under

14   § 4316(c)."  *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299 (4th Cir. 2006).

15         Defendants claim that "the undisputed evidence demonstrates that Defendants'

16   decision to terminate Ms. Reed's employment was reasonable and that Ms. Reed was on

17   notice that her conduct could result in termination." (Dkt.# 61 at 14).  However, Defendants

18   assertion depends on factual conclusions that are disputed.  For example, Defendants claim

19   that Ms. Reed was terminated for discussing the BRAVO investigation with her subordinates

20   in direct violation of Mr. Eden's orders not to discuss the investigation.  However, it is not

21   clear that Ms. Reed's communications are properly characterized as "discussions of the

22   investigation."   Defendants argue that the first discussion Ms. Reed had with her

23   subordinates regarding the investigation occurred via email, when one of Ms. Reed's

24   subordinates, Ms. Brower, sent an email to Ms. Reed expressing concern about Ms. Brower's

25   conduct in giving Ms. Carlough a BRAVO award.  (Dkt.# 62, ¶ 71; Dkt.# 65 ¶ 71)  Ms. Reed

26   responded to Ms. Brower's email as follows: "Don't upset yourself any more about this.

27   Remember . . . it's not 'making a mistake' that hurts us in most cases, the focus needs to be

28   on how we 'make the mistake RIGHT.'  You've done a great job to protect the integrity of

1   this situation."  (Dkt.# 62 ¶ 71; Dkt.# 65 ¶ 71)  Ms. Reed argues that this comments says

2   absolutely nothing about the investigation and were designed merely to comfort a frightened

3   associate.

4          The second alleged discussion of the investigation occurred when, on an unspecified

5   date, Laura Barrow told Ms. Reed that those who had something against Ms. Reed were the

6   same ones that Ms. Carlough solicited for a BRAVO award.  (Dkt.# 62 ¶ 79; Dkt.# 65 ¶ 79)

7   Ms. Reed responded, "Isn't it surprising that it's the same people that didn't want me back."

8   (Dkt.# 62 ¶ 79; Dkt.# 65 ¶ 79)  Ms. Reed also argues that this comment said nothing about

9   the investigation.   Whether these two comments were in fact "discussions of the

10  investigation" is thus a matter of opinion and is therefore best left to the jury to decide.

11         Moreover, Ms. Reed disputes when Mr. Eden specifically told her not to discuss the

12  investigation. "Plaintiff unequivocally denies violating Eden's directive, and denies speaking

13  about the investigation or failing to maintain its confidentiality.  (PSAF ¶ 32)  The parties

14  dispute whether Mr. Eden advised Ms. Reed on July 22, 2004 that the investigation should

15  be kept confidential and instructed her not to discuss the investigation with others.  (Dkt.#

16  62, ¶ 57; Dkt.# 65 ¶ 64)  Plaintiff recalls that the first such instruction was given on July 29,

17  2009, *after* she had already engaged in the communication with Ms. Brower on July 26,

18  2009.  (Dkt.# 66 at 16)

19         In addition, whether Ms. Reed received fair warning that her behavior would

20  constitute grounds for termination is also a question of fact.  Defendants argue that her

21  training on the Honeywell's Code of Conduct earlier that month constituted fair warning that

22  she could be fired for discussing the investigation.  However, the statement that Defendants

23  claim provided fair notice ("employees have a duty to cooperate fully with the company's

24  investigative process and to maintain the confidentiality of investigative information unless

25  specifically authorized or required by law to disclose such information") was a single

26  sentence that was the ninth item in a ten-item list on page 29 of a 32-page document.  (Dkt.#

27  65, PSAF ¶ 27; Dkt.# 69 at 2 [no objection])  It is therefore a question of fact for the jury

28  whether Ms. Reed received adequate notice that her discussion of the investigation could

1  constitute good cause for her dismissal.  Without such notice, she cannot have been

2  dismissed "for cause" because the statutory definition of "cause" requires notice.

3      Based on these disputed questions of material fact, Defendants' motion for summary

4  judgment is denied as to Ms. Reed's termination claim.

5                    **3.    Liquidated Damages**

6      Defendants also argue that Ms. Reed cannot establish her claim for liquidated

7  damages.  Under USERRA, liquidated damages are available only if Defendants' violation

8  of USERRA was "willful."  38 U.S.C. § 4323(d)(1)(c).  *Transworld Airlines, Inc. v.*

9  *Thurston*, 469 U.S. 111, 129 (1985) defines a "willful" violation as one where the employer

10 knew or showed reckless disregard for the matter of whether its conduct was prohibited.

11 Here, Plaintiff points to the fact that Honeywell's lawyers did not correctly determine the

12 definition of "cause" under USERRA but rather relied on Honeywell's internal definition of

13 "cause" (which did not include a notice requirement) when terminating Ms. Reed.

14 Defendants point out that Honeywell's lawyers reviewed USERRA and the applicable

15 regulations, neither of which defined "for cause" at the time.  They also argue that they

16 conducted further legal research but did not locate any definition for "cause" under USERRA

17 (and apparently did not find this requirement which was apparently only in case law at the

18 time).  Honeywell's legal error in failing to locate the proper legal definition of "for cause"

19 hardly amounts to willful or reckless disregard.  Adopting Plaintiff's argument would impute

20 "willfulness" to every employer who incorrectly interprets the law.  *See Duarte*, 366 F. Supp.

21 2d 1039 (employer's violation of USERRA was not "willful" where employer's actions were

22 based on exercise of business judgment in response to financial hardship).  Because the

23 summary judgment record is devoid of evidence that Defendants knew or showed reckless

24 disregard for whether their conduct was prohibited by USERRA, Defendants' motion for

25 summary judgment is granted as to this point and Ms. Reed's claim for liquidated damages

26 is dismissed.

27 / / /

28

1

**III.     Plaintiff's Motion for Sanctions for Spoliation of Evidence**

2       Plaintiff moves for sanctions against Defendants for spoliation of evidence.

3   Specifcally, Plaintiffs argue that Honeywell failed to preserve Mr. Eden's handwritten notes

4   after he left Honeywell's employment and seek to exclude evidence about Mr. Eden's

5   "conversations with Plaintiff and others regarding her performance, his alleged investigation,

6   including any reference to his alleged interviews of numerous employee witnesses, and his

7   report and Powerpoint presentation of his recommendations."  (Dkt.#64 at 8)

8       Mr. Eden apparently took the notes in question during his investigation of the

9   potential abuses of the BRAVO system when he interviewed at least eight of Ms. Reed's

10  subordinates  and another individual.  These were handwritten notes that he kept "forever"

11  and used in preparing his report and Powerpoint presentation in which he recommended that

12  Ms. Reed be fired.  (Dkt. # 64 at 3-4)

13      Mr. Eden left Honeywell in September 2005 and testified that he left these

14  handwritten notes in a manila file in his desk at Honeywell.  (Dkt. #64 at 4)  He testified that

15  he did not destroy these notes and that he did not take them with him.  (*Id.*)  However,

16  Honeywell apparently made no efforts to preserve these notes despite Honeywell's express

17  policy in effect at the time that required the retention of all investigation notes.  (Dkt. # 73,

18  Exh. 7 at 45)  When an attorney for Honeywell was asked what happens to notes and records

19  that are left in a departing employee's desk, she replied "Hopefully the next HR person

20  would pick them up.  But I can't tell you what happens in every case."  (Dkt. # 64 at 4)

21      Plaintiff has produced an email that demonstrates that Honeywell recognized the

22  potential for litigation regarding the BRAVO terminations as early as August 16, 2004, over

23  a year before Mr. Eden left.  (Dkt. #64 at 4)

24      Plaintiff requests that this Court exercise its discretion to impose the specific sanction

25  of excluding evidence relating to the alleged investigation that Defendants claim to have

26  conducted into the allegations against Ms. Reed and her subordinates because of Defendants'

27  failure.  (Dkt. #64 at 2)

28

A district court has the inherent power to levy sanctions for spoliation of evidence. *U.S. v. $40,955.00 in U.S. Currency*, 554 F.3d 752, 758 (9th Cir. 2009). As Defendants concede, a party's destruction of evidence need not be in "bad faith" to warrant a court's imposition of sanctions in the Ninth Circuit. *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993). Defendants argue that the loss was inadvertent and that inadvertent losses do not warrant sanctions. *Med. Lab. Mgmt Consultants v. Am Broad Cos.*, 306 F.3d 806, 824 (9th Cir 2002) (holding that trial court did not abuse its discretionary power in refusing to order an adverse inference for inadvertently lost slides that were either misplaced or stolen between a hotel room in Geneva and Defendants' expert's landing in New York City). However, in the Ninth Circuit, sanctions may be awarded even for inadvertent loss. *Leon v. IDX System Corp.*, 464 F.3d 951, 959 (9th Cir. 2006) (affirming $65,000 spoliation sanction where party had some notice of pending litigation but claimed that it overwrote computer files to protect privacy rather than to avoid litigation). Defendants attempt to distinguish this case on the basis that in *Leon*, there was no secondary evidence available of the files, whereas here, they argue, the Mr. Eden's typed summaries qualify as a reasonable approximation of the underlying handwritten notes and that these typed summaries eliminate any potential prejudice to Plaintiff. However, a review of the typewritten memoranda reveal that they are summaries of what occurred in the meetings rather than "transcriptions" of the notes spontaneously taken during a meeting. Plaintiffs are therefore left without a meaningful alternative to Mr. Eden's handwritten notes. Moreover, "[t]he duty to preserve material evidence arises not only during litigation but also extends to the period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." *World Courier v. Barone*, 2007 WL 1119196 at *1 (N.D. Cal. 2007) (quoting *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998)). Defendants apparently anticipated litigation on this matter at least a year prior to Mr. Eden's departure and the disappearance of the notes.

Without access to the notes, Plaintiffs are unable to cross-examine Mr. Eden regarding any discrepancies between the handwritten notes and his typewritten summaries. The notes

1   could have revealed inconsistencies in his testimony about what the witnesses told him and

2   might have revealed any exaggerations or mistakes in memory.  They also would have

3   revealed any inconsistencies between what the witnesses told him and what they told the

4   ultimate decisionmakers.  Plaintiffs are unable to obtain this information from any other

5   source.  Plaintiffs thus appear to have established that they are prejudiced by Honeywell's

6   inadvertent loss of Mr. Eden's notes.

7          The only remaining question is the appropriate sanction.  Plaintiffs argue that "[t]he

8   appropriate sanction is to prohibit the Defendants from offering any evidence relating to Mr.

9   Eden's conversations with Plaintiff and others in the organization regarding plaintiff's

10  conduct, his alleged investigation, including testimony and other evidence regarding witness

11  interviews or conversations between Mr. Eden and Plaintiff, as well as the product of the

12  alleged investigation, his report and Powerpoint presentation." (Dkt. # 63 at 7-8)  However,

13  any sanctions for misbehavior on the part of Honeywell is more appropriately remedied at

14  trial or at the conclusion of the case.  Based on the information presented, the Court is

15  prepared to consider an adverse jury instruction at trial.  Striking any and all evidence

16  relating to the BRAVO investigation would essentially constitute a directed verdict as it

17  would likely guarantee a verdict in Plaintiff's favor.  A directed verdict appears too harsh a

18  penalty for Defendants' alleged inadvertent conduct. *Halaco Engineering Co. v. Costle*, 843

19  F.2d 376, 380 (9th Cir. 1988) ("In cases where the drastic sanctions of dismissal or default

20  are ordered, the range of discretion for a district court is narrowed and the losing party's

21  non-compliance must be due to willfulness, fault, or bad faith.").  Plaintiff's motion for

22  sanctions for spoliation of evidence is therefore denied as premature without prejudice to

23  Plaintiff's refiling of the motion as a Motion in Limine or Request for Adverse Jury

24  Instruction prior to trial.

25          **Accordingly,**

26          **IT IS HEREBY ORDERED** denying Plaintiff's Motion for Sanctions for Exclusion

27  of Evidence without prejudice to Plaintiff's refiling of the motion as a Motion in Limine or

28  Request for Adverse Jury Instruction prior to trial.  (Dkt.# 64)

1    **IT IS FURTHER ORDERED** partially denying Defendants' Motion for Summary

2    Judgment.  (Dkt.# 61)

3    **IT IS FURTHER ORDERED** partially granting Defendants' Motion for Summary

4    Judgment and dismissing Plaintiff's claim for liquidated damages.  (Dkt.#61)

5    **IT IS FURTHER ORDERED** setting this matter for a status hearing on April 27,

6    2009 at 4:00 p.m.

7    DATED this 31st day of March, 2009.

8

9

10   _____

11   Mary H. Murgula
     United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28